REGAN, Judge.
The plaintiff, Mary Radecker, employed as a spice weigher, instituted this suit against the defendant, Blue Plate Foods, Inc., her employer, endeavoring to recover workmen’s compensation in the sum of $30 per week for a period of four hundred weeks, beginning June 12, 1953, subject to a credit of $63.58, for compensation previously paid, medical expenses not exceeding $1,000, attorney’s fees and penalties. Plaintiff asserts that she is totally and permanently disabled as a result of injuries incurred by her on May 22, 1953, when, in the course of her employment, she struck her left wrist on a metal shelf.
Defendant answered admitting the occurrence of the accident, but denied that the plaintiff was permanently and totally disabled as a result thereof and insisted that she has been paid all compensation to which she is entitled.
There was judgment in the court below in favor of the plaintiff in the amount of $27.82 per week for a period not exceeding four hundred weeks, beginning as of January 9, 1954, less a credit of $63.58 for compensation previously paid. The judgment further awarded the plaintiff an expert’s fee of $50. From that judgment the defendant has prosecuted this appeal. The plaintiff has answered the appeal requesting that the judgment be amended so to award plaintiff compensation as prayed for and that the expert’s fee be increased to the sum of $150. In oral argument before this court plaintiff’s counsel abandoned her initial claim for medical expenses, attorney’s fees and penalties.
The record reveals that on Friday, May 22, 1953, the plaintiff struck her left wrist on a metal shelf. Several days thereafter a “reddish lump” appeared at the situs of the injury and she was requested by the personnel manager, Carl R. Mundt, to report to defendant’s physician, Dr. Frank Cato. He diagnosed the condition emanating from *877 the injury as a “ganglion”, which we understand to be a hard tumor situated near a joint or connected with a tendon sheath, which usually appears elevated and round as the result of an effusion of viscid fluid into it. He advised that it be surgically removed, however, inasmuch as the plaintiff had previously arranged with Dr. Louis Gehbauer to perform a hysterectomy, he suggested that she return for treatment when that surgery and her convalescence therefrom was complete. The hysterectomy was performed in June of 1953, which caused plaintiff to ultimately obtain an unanticipated lengthy leave of absence from her employment extending from June through November, 1953.
On the last day of November, 1953, plaintiff returned to work and since the pain in her arm persisted, defendant’s personnel manager, in the early part of January, 1954, requested that she visit Dr. Cato. It was Mundt’s impression that the plaintiff actually struck her left wrist for a second time on a garlic can on or about January 6, 1954, and this was his reason for requesting her to return for another visit to Dr. Cato. On the other hand, plaintiff insisted that the only accident, the effects of which progressed and ultimately caused her total disability, occurred on May 22, 1953. In any event, she did visit Dr. Cato and after hospitalizing her, he removed the ganglion on January 9, 1954. Thereafter, she visited Dr. Cato for treatment on January 11, 19, 21, 25 and 26, 1954 and, on almost each occasion she complained of “pain” and “a weak grip.”
As a result of the operation on January 9, 1954, plaintiff was unable to resume her occupation until February 1, 1954. On the latter date she returned to her employment and Dr. Cato suggested that she be given “light work” to perform. She endeavored to discharge the relatively light duties of one or more positions in defendant’s plant, each of which required the use of both hands; plaintiff asserted that she suffered so much pain when using the left hand that she was forced to discontinue working. The last day of plaintiff’s employment was Friday, February 19, 1954.
There exists a dispute between the litigants as to whether the plaintiff informed the defendant of her inability to return to work after February 19, 1954. In this connection she stated that a telephone message to this effect was transmitted to the office of the personnel manager on Monday, February 22, 1954. The personnel manager, on the other hand, related that his office was not notified, but in response to persistent interrogation he conceded the possibility of his office having received such a message without his knowledge thereof.
In any event, plaintiff visited the offices of Dr. Cato for additional treatment on March 3, 5 and 10, 1954 and, on the latter date, the operative scar indicated increased sensitivity.
On April 23, 1954, plaintiff again visited Dr. Cato and, on this occasion, she was discharged despite the fact she still complained of pain and a keloid (excessive and connective scar tissue) had formed at the situs of the operation. Later on the same day she was informed by the personnel manager that she was “fired” for the reason that she had failed to satisfactorily explain her absence from work after February 19, 1954. On the following day she received a compensation check in the amount of $63.98, encompassing the period of January 16th through the 31st, 1954.
After the defendant’s doctor discharged the plaintiff she consulted her own physician, Dr. Gehbauer for treatment who, on the-trial of the case, expressed the opinion that sensory nerve fibres were caught in the scar tissue and the pain was being caused from the pressure on those nerve fibres; the scar was bound down to the underlying tissue because of its proximity to the tendons of the left forearm and this caused her to complain of a pulling sensation in the region of the scar when she endeavored to flex her left thumb. In consequence thereof, he expressed the opinion that predicated on his examination, treatment and knowledge of the patient, she was totally and permanently disabled and, therefore, unable to resume her former occupation *878 because of the persistent pain and weakness of grip in her left hand.
In opposition to the foregoing medical testimony defendant offered in evidence the opinions of Drs. Frank L. Cato and Charles Miangalarra.
Dr. Cato, it will be recalled, had discharged the plaintiff on April 23, 1954, as being capable of the full resumption of her employment. He related that she visited his office in November of 1954, at the request of the defendant in anticipation of the trial of this case, and, on that occasion, he found no abnormality existing in her hand or wrist except the keloid formation and the scar; there were no tendons fixed to it or bound down and, although plaintiff complained of tenderness of the scar, he convinced himself that this condition actually did not exist because he was able “to catch her off guard” and exert pressure on the scar without any complaint whatsoever.
Dr. Miangalarra, an office associate of Dr. Cato, related that he examined the plaintiff on November 8, 1954, and, as a result thereof, formulated the opinion that if plaintiff possessed the symptoms of pain that she complained of, the pathology was well above the shoulder and into the neck; “she might have a brachial plexis involvement because her symptoms, as she told them to me, involved all branches of the brachial plexis”, which could not be caused by a small scar on her wrist; in conclusion he asserted that his examination disclosed nothing but a scar and no abnormal effects emanating therefrom.
In addition to the foregoing medical evidence there appears in the record the testimony of the following lay witnesses, which was adduced on behalf of the plaintiff. John J. Radecker, plaintiff’s husband, Er-line Roppolo Radecker, her daughter-in-law, Claire Radecker Anthony, her daughter, and Marian Killbride, a registered nurse, whose husband was the plaintiff’s first cousin. Each of the foregoing witnesses corroborated the plaintiff’s testimony relating to her disability and then related that she experienced substantial pain in her left hand before and after the operation; that her hand had lost its ability to “grip” and that after the operation this condition became worse.
The initial question which the pleadings and the evidence poses for our consideration is one of fact and that is whether the plaintiff is totally and permanently disabled as a result of the accident and the operation performed in consequence thereof?
The trial judge resolved this question of fact in favor of plaintiff and our analysis of the record fails to reveal any reversible error in his conclusion.
The trial court awarded plaintiff compensation at the rate of $27.82 per week for the period of her disability not to exceed four hundred weeks, beginning January 9, 1954. The plaintiff contends that the rate of compensation should have been computed over a six-day week even though the contract of hiring was only for a five-day week and, therefore, since plaintiff earned $1.07 per hour for eight hours each day, her compensation should be $30 per week.
On the other hand, defendant maintains that the rate of compensation should be $27.04 per week and not $27.82 for the reason that plaintiff earned, on the day of the accident, $1.04 per hour for a forty-hour week, although it is conceded that her injury was progressive and that when she was operated upon for her wrist, which was the inception of her disability to work she was earning $1.07 per hour.
We are of the opinion that plaintiff’s compensation should be predicated on her earnings of $1.07 per hour for the reason that this is the amount that she actually earned when her employment was terminated because of her inability to do work of any reasonable character.
We are also of the opinion that compensation should be predicated on a five rather than a six day week.
In the relatively recent case of Scott v. Fulton Bag and Cotton Mills, La.App.1953, 65 So.2d 397, 402, we had occasion to dis *879 cuss this very problem posed by plaintiff’s contention and we asserted:
“We think that the weekly wage was correctly based on a five-day week. In Tulane Law Review, Vol. XIX, page 308, will be found a lengthy discussion of the various decisions in which the courts have considered the question of whether compensation should be paid on the basis of a five-day week, or a six-day week, or a seven-day week, and our conclusion is that, since the record here shows that plaintiff was employed regularly on a five-day week basis, although at times she may have worked an extra day or extra hours, her compensation should be based on a five-day week.”
Plaintiff further contends that compensation should begin on June 12, 1953 rather than on January 9, 1954, however, no reason is offered nor authority cited for this assertion. The record discloses that the accident occurred on May 22, 1953, but disability did not immediately ensue, and shortly thereafter the plaintiff, in order to prepare for the performance of a hysterectomy, obtained a leave of absence beginning in June and terminating in November, 1953, or for a period of about six months. From November 30, 1953, when she returned to work until January 9, 1954, the date of the wrist operation, plaintiff was paid full wages for her usual work, accordingly, we are of the opinion that the lower court was correct in permitting the recovery of compensation as of January 9, 1954, which was the date of the inception of her total disability.
The trial judge awarded an expert’s fee in the amount of $50. Plaintiff has requested that this fee be increased to the sum of $150. Defendant, on the other hand, in opposition thereto, insists that the judgment awarding this fee should be reversed inasmuch as Dr. Gehbauer did not qualify as an expert.
The record discloses that Dr. Gehbauer graduated from The College of Medicine of Tulane University in the year 1940 and thereafter he interned for two years, dividing his interneship between the City Hospital of Winston Salem, N. C. and the St. Margaret Hospital of Montgomery, Alabama. He has engaged in the practice of medicine, as physician and surgeon, since that time. Dr. Gehbauer, it will be recalled, performed the hysterectomy upon plaintiff and when she was discharged by Dr. Cato on the assumption that she had fully recovered from the operation on her wrist, she consulted Dr. Gehbauer for treatment, but after an examination, he advised her that extended treatment would not relieve the condition from which she was suffering. On the trial of the case he was called as a witness and expressed the opinion, predicated on an examination to treat plaintiff’s wrist and his knowledge of her condition obtained while she was his patient, that she was totally and permanently disabled.
It is our opinion that when a doctor of medicine, who has previously been consulted by a patient for the purpose of diagnosis and treatment, subsequently testifies on behalf of the plaintiff, not merely to relate a detailed account of his treatment as attending physician, but specifically as to the nature of the injury and the prognosis thereof, he is entitled to compensation as an expert witness in conformity with the provisions of LSA-R.S. 13:3666 which reads:
“Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of the time employed and the degree of learning or skill required.”
We are fully cognizant of the existence of some jurisprudence to the effect that where a physician is requested to examine a litigant for the sole purpose of qualifying himself to testify as an expert, most judges have imposed severe restrictions on the “expert opinions” of that class, of medical men. The record does not rele *880 gate Dr. Gehbauer’s testimony to this category. See discussion of cases quoted in 67 A.L.R. 10 (1930) and 80 A.L.R. 1527 (1932). See also 26 T.L.R. 60.
In view of what we have said, we believe that the expert’s fee should be increased from $50 to the sum of $100.
For the reasons assigned the judgment appealed from is amended by increasing the expert’s fee from $50 to $100 and, as thus amended, it is affirmed.
Amended and affirmed.